# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

ROXANNE KING; and STACY GRADY,
individually and as next of friend of her three
minor children,

        Plaintiffs,

    v.

PARKER MARCY, et. al.,

        Defendants.

CIVIL ACTION NO.: 2:17-cv-112

## <u>O R D E R</u>

     Presently before the Court is Defendants' Motion for Summary Judgment, (doc. 56), and

Plaintiffs' Motion to Dismiss Eric Butler as a Defendant, (doc. 73). This 42 U.S.C. § 1983 case

concerns Defendants' actions during a search of Plaintiff Roxanne King's residence. (Doc. 69.)[1]

The parties dispute whether Defendant Parker Marcy and fourteen other officers—David Hassler,

Hershell Garrett Wright, D.J. Walker, David Haney, Robert Corey Sasser,[2] Ronnie Cooper, _____

Butler,[3] Jeremy Stagner, Timothy Hollingsworth, Cameron Arnold, Richard Leska, Clayton

Palmer, Chris Lowther, and Resden Talbert—used excessive force in violation of the Fourth

---

[1] In its February 19, 2019 Order, the Court denied Defendants Leska, Talbert, Cooper, Lowther, Palmer, and Butler's Motions to Dismiss but ordered Plaintiffs to "file a comprehensive operative complaint" that identified "each Defendant by his or her first and last name." (Doc. 68, p. 19.) Plaintiffs filed the Amended Complaint, (doc. 69), in compliance with that Order.

[2] On June 29, 2018, Defendants Marcy, Hassler, Wright, Haney, and Walker notified the Court of Defendant Sasser's death pursuant to Fed. R. Civ. P. 25. (Doc. 36.)

[3] While Plaintiffs attempted service on Eric Butler, he was not the "Officer Butler" Plaintiffs intended to sue. (See docs. 71, 73.) Plaintiffs did not provide a first name for the correct "Officer Butler." (See doc. 69.)

Amendment and Georgia law, and whether Defendants are entitled to qualified and official immunity.[4] (Id.; doc. 56.)  Based on the undisputed facts, Plaintiffs have failed to support their 42 U.S.C. § 1983 claim with sufficient evidence to survive summary judgment.  Moreover, Defendants are shielded from Plaintiffs' state law claims by official immunity.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment, (doc. 56), and **DENIES as moot** Plaintiffs' Motion to Dismiss, (doc. 73).  The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

## BACKGROUND

### I.    Procedural History

On September 18, 2017, Plaintiff Roxanne King filed this cause of action pursuant to 42 U.S.C. § 1983 alleging injury from a December 15, 2015 search effectuated by Defendant Marcy and fourteen other officers who were identified in the Complaint as John Does 1–10 and Jane Does 1–4.  (Doc. 1.)  Upon motion by King, the Court added Stacy Grady (both individually and on behalf of three children who were in the house at the time of the search) as a Plaintiff.[5] (Docs. 6,

---

[4]  Plaintiffs' Amended Complaint states that this action also seeks to "redress" violations of the Fifth, Sixth, and Fourteenth Amendments but does not contain factual allegations in support thereof.  (Doc. 69.)  To the extent Plaintiffs wish to assert these claims, they fail as a matter of law.  First, this action arises under civil law and "the Sixth Amendment does not speak in terms of civil cases at all; by its terms it is limited to providing rights to an accused in criminal cases."  Gannett Co. v. DePasquale, 443 U.S. 368, 386 n.15 (1979).  Additionally, it is undisputed that Defendants are state actors and "[F]ifth [A]mendment protection attaches only when the *federal* government seeks to deny a liberty or property interest."  Knoetze v. U.S., Dep't of State, 634 F.2d 207, 211 (5th Cir. 1981) (emphasis added).  Finally, Plaintiffs' allegations concern the Defendant officers' use of excessive force, and "all claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a [Fourteenth Amendment] 'substantive due process' approach."  Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989).  Thus, Defendants are entitled to summary judgment as to Plaintiffs' Fifth, Sixth, and Fourteenth Amendment claims.

[5]  Although Stacy Grady was technically added in her individual capacity, it is undisputed that Grady was not present the night of the incident.  (Doc. 56-1, p. 2; doc. 69, p. 5.)  Plaintiffs do not allege that Grady was personally injured nor do they otherwise address her status as an individual plaintiff in their Amended Complaint or their Response to the Motion for Summary Judgment.  (Docs. 62, 69.)  Moreover, Plaintiffs

9.)  The Court also granted Plaintiffs' request to substitute the following fourteen individuals in place of the John and Jane Doe Defendants: "David Hassler, Garret Wright, D.J. Walker, David Haney, Corey Sasser, Officer ____ Cooper, Officer ____ Butler, Officer ____ Stagner, Officer ____ Hollingsworth, Officer ____ Arnold, Officer ____ Leska, Officer C. Palmer, Officer C. Lowther, and Investigator Resnick Talbert." (Docs. 7, 9.)  In compliance with the Court's February 19, 2019 Order, Plaintiffs subsequently filed an Amended Complaint that specified the first names of Defendants Cooper, Stagner, Hollingsworth, Arnold, Leska, Palmer, and Lowther.  (Doc. 69.)  Defendants filed the at-issue Motion for Summary Judgment on January 7, 2019.  (Docs. 56, 56-1.).  Plaintiffs filed a Response, (docs. 62), and Defendants filed a Reply, (doc. 65).  Finally, Plaintiffs filed a Motion to Dismiss Eric Butler as a Defendant on March 19, 2019.  (Doc. 73.)

## II.    Factual Background

The events giving rise to this action took place the evening of December 15, 2015, when several Glynn County police officers conducted a search at 237 Cornwall Street, Plaintiff King's home.  (Doc. 69, p. 2.)  Earlier that day, Defendant Marcy, who was investigating an armed robbery, prepared a search warrant and a supporting affidavit for that address because a suspect in the robbery had identified it as his primary residence.  (See Doc. 56-2.)  Glynn County Magistrate Judge Flay Cabiness signed the warrant at 10:03 p.m., and Marcy arrived at 237 Cornwall Street approximately twenty minutes later.  (Doc. 56-4, pp. 17–18.)  Marcy gave King a copy of the signed warrant prior to leaving her property.  (Id.; doc. 62, p. 8.)  While the parties do not dispute what took place leading up to and during the search, the warrant's authenticity, or the time the warrant was signed, they do dispute what time the search began and the degree to which each

---

do not point to, and the Court is not aware of, any facts or legal bases that would permit recovery on her behalf.  Thus, to the extent Plaintiff Grady intended to assert such claims, Defendants are entitled to judgment in their favor.  Accordingly, the Court **GRANTS** Defendants' Motion as to any and all claims asserted by Stacy Grady in her individual capacity.

Defendant was involved. Accordingly, the Court will discuss the relevant details pertaining to each issue separately.

### A. The Search of 237 Cornwall Street

The evidence, viewed in the light most favorable to Plaintiffs, shows the following. On December 15, 2015, Defendant Marcy and Defendant Talbert arrested a man named Neal Cohen in connection with a recent armed robbery. (Doc. 56-1, p. 1; doc. 56-5, p. 7.) Cohen, whom Marcy had determined was the primary suspect in the robbery, was apprehended at an apartment complex that was a "two-minute walk away" from King's house. (Doc. 56-2, pp. 1–2.) After the arrest, two officers interviewed Cohen at the Glynn County Police Department while Marcy listened from his desk. (Doc. 65-1, pp. 1–2.) In the interview—which was captured on video and submitted to the Court—Cohen stated that he lived at "237 Cornwall Street with Roxanne King and Demetrius Hall." (Id. at 18:21:59.) Marcy then prepared an application for a warrant to search the address. (Doc. 56-2, p. 2.) Eventually, Marcy spoke with Captain Tindale, one of his supervisors, about the warrant's contents and the known histories of individuals associated with 237 Cornwall Street. (Doc. 56-1, p. 4; doc. 56-4, p. 11; doc. 56-8, p. 10.) Due to a risk that the residence's occupants would be armed, the pair decided to seek permission to employ the department's SWAT team. (Id.) Tindale first contacted Defendant Hassler, a Captain in the SWAT division, and either Tindale or Hassler sought approval from Chief Doering, the chief of police at the time. (Doc. 56-8, p. 11.) Chief Doering approved the request. (Id.; doc. 56-4, p. 11.)

At some point thereafter, Marcy talked to Defendant Lowther, an investigator and member of the SWAT team. (See Doc. 56-6, pp. 6–11.) Before the SWAT team was formally called, Marcy told Lowther that the SWAT team was going to execute the search warrant. (Id. at pp. 7, 11.) Eventually, the SWAT officers were instructed to report to the department's headquarters.

(Id. at pp. 7, 9–10; doc. 56-7, p. 6.) The team then loaded into the SWAT vehicle and one of the supervisors briefed the officers. (Doc. 56-6, p. 12; doc. 56-7, p. 9.) Specifically, the team was told that they were going to "conduct a no-knock search warrant" pursuant to an armed robbery investigation and the officers were to "secure the residence." (Doc. 56-7, p. 9.) After Marcy communicated that the warrant had been signed, the SWAT vehicle transported the team members to 237 Cornwall Street. (See id., p. 18; doc. 56-6, pp. 12–13.)

The SWAT team included Stacy Talbert (who is not a named defendant), Joey Butler, and Defendants Lowther, Cooper, Hassler, Stagner, Arnold, Leska, Hollingsworth, and Sasser.[6] (Doc. 56-7, pp. 12, 19; doc. 56-4, p. 21; 56-6, p. 24.) Upon arrival, the officers broke down King's door, entered the home, and instructed everyone to get on the ground. (Doc. 59-2, p. 61; doc. 56-6, p. 13.) The team located seven people—two adult males, two adult females, and three children—in various areas throughout the home. (Doc. 56-1, pp. 5–6.) Lowther and Cooper walked into a bedroom where an adult male and an adult female in her "late teens, early 20's" were lying in the bed; the officers placed them in handcuffs and led them outside. (Doc. 56-6, pp. 13–14; doc. 56-7, pp. 12–13.) King was in another bedroom with the oldest child and the other adult male, and the adult male was walking towards the door when the police entered the room. (Doc. 59-2, pp. 68–69.) King remembers that she was on the ground when an officer handcuffed her. (Id.) According to King, the officer then walked her outside with a gun "pointed at [her] back" and eventually placed her in the back of a police car. (Id. at pp. 71–72, 75.) King told the officer that her handcuffs were too tight and that she had recently undergone surgery, but the officer told her to "shut up." (Id. at p. 73.) Meanwhile, other SWAT members escorted the three children out of the home. An officer named Stacy removed the two youngest children, aged three and seven, from

---

[6] The record does not indicate how many officers were on the SWAT team. King testified that "it was more than five or ten." (Doc. 59-2, p. 67.)

the bathtub and took them outside.  (Doc. 56-1, pp. 7–8.)  According to Plaintiffs, the children remained naked while they waited on the porch for ten or so minutes before someone wrapped them in a blanket and put them in the police car with King and their older sister.  (Doc. 59-2, p 77; doc. 59-1, p. 8.)  About thirty minutes later, an officer removed King's handcuffs and King went inside to get clothes for the children.  (Doc. 59-2, p. 78; doc. 62, p. 7.)

### (1) The Audio Recording

Notably, at some point after officers began to search the home, Marcy had a conversation with King that was captured in an audio recording.  (Doc. 56-4, p. 8.).  Defendants submitted the recording, and Plaintiffs do not object to its authenticity.  (Doc. 67, Ex. A-2.)  The Court has reviewed the recording in its entirety and provides a brief description of relevant portions of the audio below.

Sixteen seconds into the recording, King is heard saying, "I just want to see the search warrant," to which Marcy replies, "That's what I'm going to show you right now."  (Id. at 00:16–00:22.)  King says that she knows about Cohen's arrest and assures Marcy that Cohen does not live with her.  (Id. at 00:24–00:59.)  Marcy stops King and apologizes for "being rude" and introduces himself as "Parker," and King then says her name is "Roxanne."  (Id. at 01:01–01:06.)  King states that Cohen has been living in a vacant house next door and that Marcy should consider searching there.  (Id. at 01:30–01:41.)  After apologizing to King for the inconvenience, Marcy then explains, "This is the search warrant.  It was signed by Judge Cabiness tonight at 10:03, it's now 11:00."  (Id. at 01:45–02:00, 02:40–02:53.)  Marcy can be heard reading through the warrant with King, including the list of items the officers were looking for, and he then asks King if anything "ring[s] a bell."  (Id. at 02:55–06:31.)  Next, Marcy tells her that the officers would not need to "pull everything out" and could cease the search quickly if she helped them locate the

items listed in the warrant.  (<u>Id.</u> at 7:00–08:13.)  King says she understands but does not think any of the items are in her house.  (<u>Id.</u>)  After a brief pause in the conversation, Marcy and King discuss an item that another officer had just found in the "back bedroom."  (<u>Id.</u> at 08:10–09:31.)

Next, Marcy takes down King's information as well as the names and ages of the three children. (<u>Id.</u> at 09:33–12:00.) When they finish, Marcy asks King for the contact information for the owner of the neighboring vacant house.  (<u>Id.</u> at 12:00–12:06.)  Marcy tells King that the officers were "probably going to try and get that [search] started at the same time, while we're here already . . . especially because if I find the crap in there, I can get out of your house."  (<u>Id.</u> at 12:19–12:31.) About two minutes later, King thanks a female officer, who identifies herself as "Stacy," for watching the children.  (<u>Id.</u> at 14:30–14:45.)  Stacy asks Marcy if he needs anything and Marcy responds, "To find the items on this list so we can go home."  (<u>Id.</u> at 14:45–14:50.)  For the next five or so minutes, King and the officers talk about where certain items might be located, Cohen's residence, and Cohen's previous interactions with law enforcement.  (<u>Id.</u> at 14:50–19:40.)  Marcy comments, "I'm glad we brought you in here, otherwise I would have been in here for like an hour and would have come outside all disappointed."  (<u>Id.</u> at 19:49–19:53.)  For the remainder of the recording, King can be heard looking for the contact information for the owner of the vacant house and talking with Marcy and the other officers.  (<u>Id.</u> at 19:53–23:19.)

### (2)    Dispute as to the Timing of the Search

As noted above, the parties dispute what time the search began.  Defendants maintain that the search did not begin until after the warrant was signed and, in support, they point to the audio recording in which Defendant Marcy is heard telling King it is 11:00 as he shows her the search warrant.  Defendants aver that this indicates that the search was just getting started at that time. (Doc. 65, pp. 4–5.)    Plaintiffs, however, allege that officers entered King's home before the

warrant was signed.  (Doc. 62, p. 5.)  In support, Plaintiffs point to King's affidavit—submitted with their Response—which states that she recalls officers arriving between 8:00 p.m. and 8:30 p.m., "less than an hour" after she got home from work.  (Doc. 62-2, pp. 1–2.)

### (3)    Review of Each Defendant's Involvement

Defendants contend that Plaintiffs have not established "what role any of the Defendants played with respect to handcuffing King, handcuffing the oldest child, or removing any of them from the house."  (Doc. 56-1, p. 9.)  Because all fifteen Defendants move for summary judgment, it is imperative to establish the extent of each one's involvement based on the record before the Court.[7]

### a.    Defendants Wright and Butler

The record does not establish Defendant Wright's presence at the scene, and Plaintiffs concede that Defendant Butler was not involved in any capacity.  (Doc. 62, p. 3.)

### b.    Defendant Marcy

Defendant Marcy was the lead investigator on the armed robbery case and he prepared the search warrant for 237 Cornwall Street.  (Doc. 56-1, p. 3.)  After Judge Cabiness signed the warrant at 10:03 p.m., Marcy drove to King's house.  (Doc. 56-4, p. 18.)  Additionally, Marcy believes that, before he went to King's house, he called a SWAT commander to relay that the warrant had

---

[7] Plaintiffs fail to provide citations to support most of the factual assertions in their Response.  This "failure to cite to the record in their memoranda [opposing the] motion for summary judgment is sloppy, to say the least," Graham v. Village of Niles, No. 02 C 4405, 2003 WL 22995159, at *5 n.2 (N.D. Ill. Dec. 16, 2003), and the Court was forced to scour the record, expending valuable judicial resources.  This is not the Court's duty.  "[J]udges are not like pigs, hunting for truffles buried in briefs."  United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).  Likewise, judges "are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."  Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662–63 (7th Cir. 1994).  Judges need not endeavor to "fish a gold coin from a bucket of mud."  U.S. ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003).  Plaintiffs' counsel should not expect this Court or any other court to perform this work for them in the future.

been signed.  (Id.)  Marcy testified that he arrived shortly after the SWAT team entered the house

and that he walked inside, at which point Hassler told him to wait outside.  (Doc. 56-1, p. 9.)

Within thirty minutes of his arrival, Marcy spoke with King and gave her a copy of the signed

search warrant.  (Doc. 65-1.)  Eventually, King and Marcy went inside the home together.  (See

Doc. 67, Ex. A-2.)  Marcy remembers seeing two children in blankets in front of the house.  (Doc.

56-4, pp. 25, 33.)

### c.        Defendants Walker and Haney

Defendants Walker and Haney were investigators.  The only evidence that specifically

pertains to their involvement at the search of the King home is testimony from Defendant Marcy

that he observed them outside of the home that night.  (Id.)

### d.        Defendant Sasser

Defendant Sasser was an assistant SWAT commander at the search.  (Doc. 56-6, p. 24;

doc. 56-7, p. 19.)  During the SWAT briefing, Sasser told the officers "what [they were] doing and

how [they were] going to make entry into the house."  (Id.)  Marcy testified that he may have called

Sasser to let him know Judge Cabiness had signed the warrant.  (Doc. 56-4, p. 18.)

### e.        Defendant Lowther

Defendant Lowther was a SWAT team member.  (Doc. 56-6, pp. 12–13.)  After he entered

King's house, Lowther went into a bedroom with Defendant Cooper.  (Id. at pp. 13–14.)  The pair

encountered an adult male and an adult female in her "late teens or early 20's" lying in the bed.

(Id.; doc. 56-7, p. 13.)  Lowther placed the female in handcuffs, led her outside, and went back

inside to ensure the house was clear.  (Doc. 56-6, pp. 16–17.)  He then took off his SWAT gear

and "assumed the role of investigator" to search the house for evidence.  (Id. at p. 20.)  Lowther

remembers seeing children outside but does not recall how they were dressed.  (Id. at p. 23.)

### f. Defendant Cooper

Defendant Cooper was a SWAT team member who searched the same bedroom as Lowther. (Id. at pp. 13–14; doc. 56-7, p. 13.) Cooper handcuffed the adult male and took him outside to the front yard. (Doc. 56-7, pp. 13–15.) After the house was cleared, Cooper took over "perimeter security" and did not reenter the residence. (Id. at p. 16.) Cooper does not remember any children at the scene. (Id. at p. 17.)

### g. Defendant Talbert

Defendant Talbert was an investigator who entered the house after the SWAT team had cleared it. (Doc. 56-5, p. 16.) Talbert took photos during the search. (Id.) Talbert remembers seeing children wrapped in blankets. (Id. at pp. 10–12.)

### h. Defendant Hassler

Defendant Hassler was an assistant SWAT commander. (Doc. 56-6, p. 24.) Captain Tindale spoke with Hassler about employing the SWAT team, and Hassler may have requested Chief Doering's approval. (Doc. 56-8, p. 11.) The only over evidence surrounding Hassler's involvement is Marcy's recollection that, while the SWAT team cleared the house, Hassler told him to go back outside. (Doc. 56-4, p. 19.)

### i. Defendants Stagner, Arnold, Leska, and Hollingsworth

Defendants Stagner, Arnold, Leska, and Hollingsworth were members of the SWAT team. (Doc. 56-4, pp. 42–43.) In his deposition, Marcy testified that he did not recall any of these officers' actions aside from their presence at the scene. (Id.) Plaintiffs do not offer any additional evidence about their involvement.

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611,

616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Id.</u> (emphasis and citations omitted).

## DISCUSSION

### I.      The Parties' Arguments

Plaintiffs' Amended Complaint contains the following factual allegations: (1) King's door was "busted down;" (2) Defendants entered the home with firearms while "making threats of serious bodily injury;" (3) King was handcuffed; (4) the children were removed from the home without clothes on; and (5) King suffered physical and mental injuries.[8]  (Doc. 69, p. 2.)  The Complaint alleges that Plaintiffs are entitled to damages for this "wrongful assault and battery." (<u>Id.</u> at p. 3.)  Although the Amended Complaint does not make this clear, it seems Plaintiffs intended to assert the following claims against all Defendants: (1) a claim pursuant to 42 U.S.C. § 1983 for subjecting Plaintiffs to an unreasonable seizure in violation of the Fourth Amendment; (2) a claim for assault and battery in violation of Georgia law; (3) a claim for "willful" infliction of emotional distress in violation of Georgia law; and (4) claims for attorney's fees and punitive damages.  (<u>Id.</u> at pp. 2–3.)

Defendants move for summary judgment as to all claims asserted against them.  They first argue that Plaintiffs' Section 1983 claim fails as a matter of law because the record demonstrates "no aspect" of the search or seizure violated the Fourth Amendment.  (Doc. 56-1, p. 2.)

---

[8] The Amended Complaint does not allege any physical injury on behalf of the three minor children.  (Doc. 69, p. 2.)

Specifically, Defendants maintain that Plaintiffs cannot show that either King or the children's detentions were unreasonable. (Id.) However, even if a constitutional violation did occur, Defendants contend they cannot be held liable because Plaintiffs do not allege or provide evidence to show that any such violation was caused by any specific Defendant. (Id. at p. 17.) Alternatively, Defendants argue they are entitled to qualified immunity. (Id. at pp. 19–22.) Finally, Defendants allege that Plaintiffs' state law claims are barred by official immunity because executing a warrant is a discretionary function and Plaintiffs cannot show any Defendant acted with actual malice. (Id. at pp. 23–25.)

In their Response, in lieu of specifically addressing Defendants' Fourth Amendment argument, Plaintiffs make various factual assertions about how King and the children were treated. Plaintiffs fail to identify the legal relevancy of the officers' alleged conduct during the search and their detentions and, more often than not, neglect to provide record citations to support their factual allegations. These failures alone provide grounds for granting Defendants' Motion, as Plaintiffs have failed to address Defendants' legal arguments and they have failed to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

Plaintiffs claim their failure to "attribute particular allegations of misconduct to each individual Defendant" is immaterial because each Defendant "could have submitted an Affidavit that established that the particular Defendant did nothing illegal or unconstitutional with regard to the Plaintiffs." (Doc. 62, p. 3.) However, most of Plaintiffs' Response is dedicated to a new theory of liability based on evidence obtained during discovery. Relying on King's recollections portrayed in her deposition and affidavit, Plaintiffs argue that the officers began the search around 8:00 or 8:30 p.m.; thus, Plaintiffs contend there is sufficient evidence tending to show that "the

search and seizure was unconstitutional from the beginning" because it began before the warrant was signed, and that all acts or omissions thereafter were similarly unconstitutional. (Id.; doc. 62-2.) Said differently, Plaintiffs argue—without alleging which officer is responsible for what conduct—that *all* Defendants are liable for: (1) the warrantless search itself and (2) handcuffing King and removing the unclothed children from the house. (Id. at p. 18.)

For the reasons set forth below, the Court finds that Plaintiffs cannot recover based on the "warrantless search" theory and that Defendants are entitled to summary judgment as to Plaintiffs' original Fourth Amendment claim.

## II. 42 U.S.C. § 1983: Fourth Amendment

### A. Plaintiffs did not Plead a "Warrantless Search" Fourth Amendment Theory and Cannot Expand their Claim via their Response to Defendant's Motion for Summary Judgment

As noted above, Plaintiffs' Amended Complaint contains only the following factual allegations: (1) King's door was "busted down;" (2) Defendants entered the home with firearms while "making threats of serious bodily injury;" (3) King was handcuffed; (4) the children were removed from the home without clothes on; and (5) King suffered physical and mental injuries. (Doc. 69, p. 2.) The only reference to the Fourth Amendment is in a paragraph discussing the alleged "wrongful assault and battery committed upon the Plaintiff," and the pleading does not reference a search, a search warrant, or a warrantless search. (Id. at p. 3.) Defendants relied on these factual assertions in conducting discovery and in composing their Motion for Summary Judgment, and they reasonably and logically understood Plaintiffs' Fourth Amendment claim to be premised only upon a theory of excessive force. (See Doc. 56-1, pp. 12–13.) Because the Amended Complaint gave no indication that Plaintiffs intended to challenge the propriety of the timing of the search, Defendants' Motion is devoid of any arguments addressing any such issue.

(Doc. 56-1.)  In response to the summary judgment motion, however, Plaintiffs rely on King's affidavit to state that the search began at 8:00 or 8:30 p.m. and to allege, for the first time, that Defendants violated the Fourth Amendment by conducting a search prior to obtaining a valid warrant.  (Doc. 62.)  Plaintiffs cannot rely on this newly created evidence and newly asserted theory to defeat summary judgment.

The Eleventh Circuit Court of Appeals has explained, in no uncertain terms, that a plaintiff may not raise new claims in a response to a motion for summary judgment:

> The current practice in some district courts—especially in the summary judgment setting—is to ignore what the respective parties alleged in their complaint and answer and to consider their claims and defenses as depicted in the memoranda they filed in support of or in opposition to a motion for summary judgment.  As is the situation here, the claims and defenses presented in the memoranda supporting or opposing summary judgment are not presented in the complaint and answer with the specificity required by the Federal Rules of Civil Procedure and [] Supreme Court[ precedent]; rather, they are presented in a shorthand fashion.  The result is that on appeal we have difficulty in determining whether the district court, in granting summary judgment, ruled on the claims and defenses as stated in the complaint and answer or as stated in the memoranda submitted to the court on summary judgment, as if the pleadings had been amended by implied consent. . . .  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."

Flintlock Constr. Servs. v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227–28 (11th Cir. 2013) (internal citations omitted) (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).

The subsequent case of Cacciamani v. Target Corporation illustrates this principle.  622 F. App'x 800 (11th Cir. 2015) (per curiam).  The complaint in Cacciamani asserted a negligence claim against defendant Target, alleging that Target "allowed a [dangerous] condition to exist and failed to warn customers of that condition."  Id. at 804–05.  In their summary judgment response, the plaintiffs theorized that Target could also be liable for negligence under a "mode of operation" theory.  Id. at 804.  This claim alleged that Target was negligent for having operating procedures

that "resulted in the creation of a dangerous or unsafe condition." Id. In affirming the lower

court's refusal to consider the plaintiffs' new liability theory, the Eleventh Circuit explained,

> Quite clearly, the complaint asserted a negligence claim based on defendant Target "allow[ing] a dangerous condition to exist on its premises" and "failing to correct or warn of this condition" of which Target "either knew or should have known." Discovery proceeded on the basis of this allegation. So too did defendant Target's Motion for Summary Judgment. Only in response to that motion did plaintiff [] develop this alternate theory . . . . [The] complaint did not allege that Target had a specific policy or rule in place that created the dangerous condition . . . . Defendant Target thus was not on notice that plaintiff [] ever intended to raise the "mode of operation" theory in support of his negligence claim.

Id. at 804-05.

Like the plaintiffs in Cacciamani, Plaintiffs in the present case assert a new theory of

liability in their Response under the guise of their existing Fourth Amendment claim. Because the

Amended Complaint speaks in terms of behavior that caused physical injury, Defendants did not

have notice of Plaintiffs' "warrantless search" claim until *after* Plaintiffs' responsive summary

judgment brief was filed. See Feliciano v. City of Miami Beach, 707 F.3d 1244, 1249 (11th Cir.

2013) (explaining that Plaintiff asserted numerous distinct Fourth Amendment claims and

discussing warrantless search claim independently of excessive force claim).

While Plaintiffs were certainly entitled to raise new issues related to the search after

learning about them in discovery,[9] "the proper procedure for plaintiffs to assert a new claim is to

amend the complaint in accordance with Fed. R. Civ. P. 15(a)." Flintlock, 710 F.3d at 1228.

Plaintiffs failed to do so. As such, Plaintiffs' claim for recovery due to the alleged warrantless

---

[9] It is noteworthy that, in this case, the new theory is not premised upon some discreet detail that Plaintiffs uncovered through discovery but is instead premised exclusively upon Plaintiff King's recollection that differs from information in a document that is central to this case (i.e., the time listed on the warrant). Indeed, King admits to receiving a copy of the warrant on the night of the search. (Doc. 62, p. 3.) Thus, this is not a new theory that could not have become apparent to Plaintiffs until some information was provided to them by another party during discovery. Rather, it is based on a recollection King supposedly had dating back to the night of the warrant but only disclosed in the recent affidavit and response brief.

search is not properly before the Court and will not be considered.  See Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir. 2013) (district court improperly narrowed plaintiff's broadly-asserted equal protection claim by relying on specificity provided by plaintiff in responsive pleading); GeorgiaCarry.Org, Inc v. Georgia, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) (disregarding new facts alleged in plaintiffs' motion for summary judgment, through which plaintiffs sought to re-frame their case, and finding that "[t]he allegations in the Amended Complaint, as Plaintiffs chose to frame their case, do not state a Free Exercise claim"); Harris v. Tolen, No. 2:17-CV-00235-RWS, 2019 WL 1170502, at *7 (N.D. Ga. Mar. 12, 2019) ("Plaintiffs' Complaint does not suggest that Defendants lied or manipulated evidence in violation of Plaintiffs' constitutional rights; in fact, Plaintiffs' Complaint includes no allegations, whatsoever, related to Defendants' conduct after the incident."); Griffin v. Sun N' Lake of Sebring Improvement Dist., No. 2:16-CV-14062, 2017 WL 3835878, at *6 (S.D. Fla. Mar. 23, 2017) ("Plaintiff is not asserting a new 'claim' in the strict sense—Count II of his Complaint contains a § 1983 claim grounded in the First Amendment.  Plaintiff is, however, asserting an entirely new basis for a First Amendment violation.  . . .  [The c]ourt will not permit Plaintiff to assert a new basis for his First Amendment claim at this late stage.") (relying on Hulbert v. St. Mary's Healthcare Sys., Inc., 439 F.3d 1286, 1296–97 (11th Cir. 2006) ("[A]n additional, separate statutory basis for entitlement to leave . . . effects a fundamental change in the nature of [Plaintiff's] interference claim.")).

**B.**     **Plaintiffs' Fourth Amendment Claim Fails because They have not Shown that any Defendant Took Part in the Alleged Constitutional Violations**

Defendants argue they are entitled to judgment in their favor as to Plaintiffs' Fourth Amendment claim because there is no evidence of unlawful conduct and, even if there was, Plaintiffs failed to show that any particular Defendant was responsible for it.  In response, Plaintiffs

contend this argument "misse[s] the mark" because "each individual Defendant, if they could do so truthfully, could have submitted an Affidavit that established that the particular Defendant did nothing illegal or unconstitutional." (Doc. 62, p. 3.) Plaintiffs then allege that Defendants' mere presence at the "search and detention" is sufficient to impose liability because they failed to "intercede when this clearly unconstitutional event was going on." (Id. at p. 18.) The Court agrees with Defendants and grants summary judgment in their favor.

It is well-established that "[t]o establish § 1983 liability, a plaintiff must show 'proof of an affirmative causal connection' between a government actor's acts or omissions and the alleged constitutional violation . . . ." Brown v. City of Huntsville, 608 F.3d 724, 737 (11th Cir. 2010); see Troupe v. Sarasota County, 419 F.3d 1160, 1165 (11th Cir. 2005) ("Recovery of damages [in Section 1983 cases] is limited to those injuries proved to be caused by the defendants."). Plaintiffs have not made—or attempted to make—this showing. In fact, Plaintiffs openly acknowledge their lack of individualized allegations and attempt to transfer their evidentiary burden to Defendants. (See doc. 62, p. 3.) Plaintiffs misapprehend their burden at the summary judgment stage. Because they carry the ultimate burden of proving a causal connection between each Defendant's conduct and any constitutional violation, in response to Defendants' Motion, they were required to go beyond the pleadings and present affirmative evidence to show the existence of a genuine fact dispute. Anderson, 477 U.S. at 257. They have failed to do so. Plaintiffs have not cited, and the Court has not found, any evidence tending to show that any particular Defendant handcuffed King, removed the children from the bathtub, or assisted with either act in any way. Tindal v. Montgomery Cty. Comm'n, 32 F.3d 1535, 1541 (11th Cir. 1994) (summary judgment proper where no evidence showed defendant's involvement); see also Brown, 608 F.3d at 737 (11th Cir. 2010) (officer's mere presence at scene of arrest insufficient causal connection); Murdock v. Cobb

County., No. 1:12-CV-01743-RWS, 2013 WL 2155465, at *10 (N.D. Ga. May 17, 2013) (plaintiff cannot show causation simply by alleging that officers failed to stop the constitutional violation, but must include evidence that the officers were in a position to avert the alleged constitutional deprivation); Urbanique Prod. v. City of Montgomery, 428 F. Supp. 2d 1193, 1220 (M.D. Ala. 2006) (defendant officers entitled to qualified immunity where plaintiff had no evidence officers were involved in at-issue arrest).

Moreover, as to Plaintiffs' claim that Defendants can be liable for "failing to intercede," Plaintiffs have not alleged facts *or* law to support this allegation. In the absence of such evidence, the Court cannot identify "the precise constitutional violation [each D]efendant has allegedly committed," let alone establish any causation between Defendants and that violation. Alcocer v. Mills, 906 F.3d 944, 952 (11th Cir. 2018) (internal quotations omitted); see also Murdock v. Cobb County., No. 1:12-CV-01743-RWS, 2013 WL 2155465, at *10 (N.D. Ga. May 17, 2013) (plaintiff cannot show causation simply by alleging that officers failed to stop the constitutional violation, but must include evidence that the officers were in a position to avert the alleged constitutional deprivation). Because Plaintiffs have not proffered any evidence as to how any particular Defendant was responsible for or took part in any alleged violation of Plaintiffs' Fourth Amendment rights, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## II. Claims Pursuant to Georgia Law: Official Immunity

Defendants also argue that they are entitled to official immunity as to each of Plaintiff's state law claims. (Doc. 56-1, pp. 22–25.) In Georgia, the doctrine of official immunity "offers public officers and employees limited protection from suit in their personal capacity." Cameron v. Lang, 549 S.E.2d 341, 344 (Ga. 2001); see also Crosby v. Johnson, 779 S.E.2d 446, 450 (Ga. Ct. App. 2015) ("When a county official is sued in his individual capacity, the doctrine of official

immunity . . . is implicated."). Under the doctrine of official immunity, state officers and employees are "immune from individual liability for discretionary acts undertaken in the course of their duties and performed without willfulness, malice, or corruption." Reed v. DeKalb County, 589 S.E.2d 584, 586 (Ga. Ct. App. 2003). Here, the parties do not dispute that each Defendant was acting within his or her discretionary authority. (Doc. 56-1, p. 22–24; doc. 62.) As such, the burden shifts to Plaintiffs to show that Defendants acted with actual malice. See Reed, 589 S.E.2d at 588 (summary judgment granted where plaintiff failed to offer evidence of actual malice).

In the context of official immunity, "actual malice" requires "a deliberate intention to do wrong." Adams v. Hazlewood, 520 S.E.2d 896, 898 (Ga. 1999). "Actual malice requires more than harboring bad feelings about another. [The] presence [of ill will] alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal." Id. Evidence that merely shows "an intent to do the act purportedly resulting in the claimed injury[]" does not suffice. Selvy v. Morrison, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008). Similarly, "deliberate intention to do wrong" means "the intent to cause the harm suffered by the plaintiff[]." Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007).

Here, Plaintiffs have not put forth sufficient evidence to show that any Defendant acted with actual malice. As reiterated throughout this Order, the record is devoid of evidence tending to show action on behalf of any Defendant, let alone that Defendants intended to cause Plaintiff harm. Accordingly, the Court finds that Defendants are entitled to official immunity from Plaintiff's state law claims and **GRANTS** Defendants' Motion on this issue.

### III.    Damages

#### A.    Punitive Damages

Plaintiffs also claim they are entitled to punitive damages.  (Doc. 62, p. 3.)  Under Georgia law, punitive damages may only be awarded if there is a valid claim for actual damages to which they could attach; punitive damages may not be recovered if there is no entitlement to compensatory damages.   O.C.G.A.  §  51-12-5.1(b);  see  J. Kinson  Cook  of  Ga.,  Inc.  v. Heery/Mitchell, 644 S.E.2d 440, 449 (Ga. Ct. App. 2007).  Similarly, "[a] plaintiff in a § 1983 suit cannot recover punitive damages unless he first demonstrates that he has been deprived of a right secured by the Constitution or laws of the United States."  Curves, LLC v. Spalding County, No. 3:07-CV-10-JTC, 2010 WL 11507905, at *7 (N.D. Ga. July 23, 2010), aff'd, 685 F.3d 1284 (11th Cir. 2012).  For the reasons discussed above, Plaintiff cannot recover on any claims against Defendants under Georgia law or 42 U.S.C. § 1983.  Without any remaining underlying claims, Plaintiffs are not entitled to punitive damages, and the Court **GRANTS** Defendants' Motion on this issue.

#### B.    Attorney's Fees

Plaintiffs also make a general request for attorney's fees.  (Doc. 69, p. 4.)  Like a claim for punitive damages, however, a claim for attorney's fees under Georgia law requires a viable underlying claim.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1316 (11th Cir. 2004) (citing United Cos. Lending Corp. v. Peacock, 475 S.E.2d 601 (Ga. 1996)).  The same principle applies when a plaintiff seeks to recover attorney's fees under federal law.  See 42 U.S.C. § 1988 (providing that the court may allow "the *prevailing party*, other than the United States, a reasonable attorney's fee") (emphasis added).  Because none of their claims survive summary judgment,

Plaintiffs' claim for attorney's fees also fail. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants on this claim.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment, (doc. 56), and **DENIES as moot** Plaintiffs' Motion to Dismiss Eric Butler as a Defendant, (doc. 73). The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED**, this 19th day of September, 2019.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA